STATE OF MAINE                                    SUPERIOR COURT

Cumberland, ss.

FLAGG PARTNERS, LLC

                    Plaintiff

        v.                    Civil Action Docket No. CUMSC-RE-18-0263

SIMBA, INC.,

                    Defendant

## DECISION AND JUDGMENT

This case came before the court for a jury-waived trial August 27-30, 2019, with Plaintiff Flagg Partners, LLC ["Flagg"] and Defendant Simba, Inc. ["Simba"] presenting evidence in the form of sworn testimony and exhibits. The trial was electronically recorded. The trial included a view of the property at issue in the case.

Flagg and Simba own adjacent commercial properties along Fore Street in Portland. The focus of the trial was on Flagg's claim that Simba has abandoned Simba's easement rights over a portion of Flagg's property—a claim as to which each party has requested a declaratory judgment—and Simba's counterclaim for slander of title. At the outset of trial, the court made oral rulings on various motions of the parties. Those rulings are summarized in the court's Supplemental Order on Pretrial Motions and Objections dated August 30, 2019, which is incorporated by reference in this Decision and Judgment.

REC'D CUMB CLERKS OFC
JAN 6 '20 PM 1:40

Following trial, the parties submitted proposed findings of fact and conclusions of law in the form of briefs, and also submitted replies to each other's filing. Briefing was complete November 12, 2019, at which time the court took the case under advisement.

The following claims are addressed in this Decision and Judgment:

- The parties' requests for declaratory judgment, contained in Count I of Flagg's First Amended Complaint and Count I of Simba's Counterclaim--regarding the nature and extent of Simba's easement rights in the portion of Flagg's property known as Bradbury Court.

- Flagg's claim in Count II of its First Amended Complaint seeking to quiet title pursuant to 14 M.R.S. § 6652 on the ground that Simba has abandoned its easement in Bradbury Court.

- Flagg's boundary by acquiescence claim in Count III of its First Amended Complaint regarding the common boundary between its property and Simba's property.

- Simba's claim in Count III of its Counterclaim for slander of title.

- Simba's claim for injunctive relief in Count II of its Counterclaim.

Based on the entire record and the view of the property at issue, the court hereby makes and adopts the following findings of fact and conclusions of law, and renders judgment as set forth below. All deed references are to deeds recorded at the stated books and pages at the Cumberland County Registry of Deeds.

2

A. *The Parties and Their Properties*

1.      Plaintiff Flagg is a Maine limited liability company owned by Toros and Marianne Hovivian that holds record title to the property commonly known as 208 Fore Street in Portland, Maine (the "Flagg Property").

2.      Flagg acquired the Flagg Property through a quitclaim deed from Antigonish Holding Co., dated June 29, 2017 and recorded at Book 34121, Page 143.

3.      Simba, Inc. is a Maine corporation whose president and treasurer is Roger Hale.

4.      Simba purchased the property commonly known as 216 Fore Street in Portland, Maine (the "Simba Property") through a quitclaim deed dated February 27, 1992 from Fleet Bank of Maine, assignee of Federal Deposit Insurance Company ("FDIC"), Receiver for Maine Savings Bank, recorded in Book 9940, Page 159. Since acquiring its property, Simba has used the property as a commercial parking lot.

5.      The Simba Property consists of multiple contiguous parcels that were assembled into the present Simba Property by Simba's predecessor, Chase Transfer Corporation. *See* Deeds at Book 777, Page 277; Book 775, Page 42; Book 884, Page 224; and Book 1737, Page 196. The contiguous parcels constituting the Simba Property include two parcels benefited by an easement over Bradbury Court, referred to as "the Benefited Parcels" and described in detail below.

3

6. The Simba Property abuts two different areas that have each been known historically as Bradbury Court. The Bradbury Court at issue in this case runs in a southerly direction from Fore Street and forms the westerly portion of the Flagg Property and is abutted to the south and west by the Simba Property. The other Bradbury Court runs from Franklin Street in a northerly direction before cutting east down to Commercial Street, where it abuts the Simba Property's south boundary.

7. Both Bradbury Courts are depicted on Simba's boundary survey in the record as Trial Exhibit 9. All references to "Bradbury Court" in this Decision and Judgment refer to the Bradbury Court that runs off Fore Street, not the Bradbury Court that runs between Commercial and Franklin Streets.

B. *Flagg's Ownership Interest in Bradbury Court*

8. The common source of Flagg's ownership interest in Bradbury Court and Simba's easement in Bradbury Court is Henry Bradbury. Trial Transcript vol. I ["Tr. I"] at 84:3-12. Henry Bradbury held fee title to what is now designated as Bradbury Court, and Flagg's title to Bradbury Court and Simba's easement rights in Bradbury Court both derive from Henry Bradbury's fee ownership of Bradbury Court.

9. Henry Bradbury's heirs granted Flagg's predecessor-in-title, Lewis Lerman, "any and all title and rights of the grantors herein in and to said Bradbury Court." *See* Deeds at Book 884, Page 239, Book 884, Page 477, Book 888, Page 55

4

and Book 888, Page 57. As an example, the deed recorded at the Cumberland County Registry of Deeds at Book 888, Page 55, sets out the basis through which grantors' claim title to Henry Bradbury's residual property as the living heirs to Francis E. Bradbury. On that basis, genealogical research confirmed Francis E. Bradbury's familial relationship to Henry Bradbury, vesting Francis Bradbury—and his heirs—with ownership of Bradbury Court after Henry Bradbury's death. *See* Tr. I at 97:4-98:17.

10. A June 27, 1956 warranty deed from Quality Home Furnishings Co. Inc. to Fore Street Corp., and recorded at Registry of Deeds Book 2302, Page 123 includes "any and all title and rights of the Grantor herein in and to said Bradbury Court," with covenants that Quality Home Furnishings was lawfully seized in the fee of the premises, and that the premises were free of incumbrances. *See* Deed at Book 2302, Page 123; Summ. Ex., Flagg's Chain of Title.

11. Although Simba has challenged Flagg's claim of title to Bradbury Court, mainly by pointing out discrepancies in various references to Flagg's square footage, Simba has not identified any other entity or person as the true owner of Bradbury Court.

12. In any event, the facts in evidence establish that Flagg has a sufficient ownership interest in Bradbury Court to have standing to seek declaratory relief regarding the nature, scope and current status of Simba's easement rights in Bradbury Court. Tr. I at 54:4-57:6, 98:15-17; Deeds at Book 884, Page 239; Book

884, Page 477; Book 888, Page 55 and Book 888, Page 57.) *See Sargent v. Coolidge,* 399 A.2d 1333, 1342 (Me. 1979).

C. *The Origins and Scope of Simba's Bradbury Court Easement*

13. The Bradbury Court easement at issue was created by Henry Bradbury by means of separate conveyances of two adjacent landlocked lots abutting Bradbury Court. Both conveyances occurred in 1871 and both were by Henry Bradbury to Portland Steam Packet Co.

14. The first conveyance occurred on June 13, 1871 by virtue of the deed to Portland Steam Packet Co. recorded at the Cumberland County Registry of Deeds (the "Registry of Deeds") in Book 386, Page 401.

15. The conveyance granted Portland Steam Packet Co. fee title to a landlocked parcel located westerly of Bradbury Court, along with an easement right over land retained by Bradbury as a "right-in-common to said Bradbury's Court to pass to and from said Fore Street." *Id.;* Ex. 3. The grantor's retained land referred to as Bradbury's Court is the Bradbury Court that is the subject of this case.

16. The second conveyance by Henry Bradbury to Portland Steam Packet Co. occurred on August 30, 1871, by the deed recorded at the Registry of Deeds in Book 388, Page 95. *See also* Ex. 3. The second parcel abuts Bradbury Court on the north (or Fore Street) side of the parcel conveyed to Portland Steam Packet Co. in June 1871. *Id.* The second parcel was not granted an express easement to access

Fore Street via Bradbury Court, but was landlocked and therefore also benefited by an easement by necessity over Bradbury Court. *Id.*

17.     The Bradbury Court easement gave the two benefited Portland Steam Packet Co. parcels access to and from Fore Street via the parcels' common boundary running along Bradbury Court's westerly sideline. Tr. I at 65:16-66:21; Deeds at Book 386, Page 401, Book 388, Page 95.

18.     The two parcels Henry Bradbury granted to Portland Steam Packet Co. that are benefited by the Bradbury Court easement (hereinafter the "Benefited Parcels") are identified as Parcel B and Parcel C on the Summary Exhibit of Simba's Chain of Title and are also shown on Exhibit 3 as the June 13, 1871 lot from Henry Bradbury to Portland Steam Packet Co. and the August 30, 1871 lot from Bradbury to Portland Steam Packet Co. Tr. I at 103:7-21; Ex. 3.

19.     Exhibit 3 is a 1950 survey that accurately delineates the location and origin of several different parcels that Simba's predecessors-in-title combined after 1871 to form the property now owned by Simba. Tr. I at 14:21-15:1, 15:24-16:1; Ex. 3; Summ. Ex. Simba's Chain of Title (showing Parcels A,B,C,D, and E merged into Chase Transfer Corp. by 1944).

20.     Exhibit 3 accurately depicts the bounds of the Benefited Parcels as they were originally described and conveyed in the 1871 deeds. Tr. I at 20:3-8; Ex. 3.

7

21. Exhibit 3 shows that the two Benefited Parcels have a combined frontage of about 111 feet on the westerly side of Bradbury Court.

22. Exhibit 3 illustrates the metes and bounds of a third parcel that Portland Steam Packet acquired from third parties unrelated to Henry Bradbury by deeds dated in October and November 1871. Ex. 3 (showing L-shaped parcel west of the Benefited Parcels).

23. Portland Steam Packet's after-acquired parcel, together with the Benefited Parcels from Bradbury, combine to match the general depiction of the Portland Steam Packet Co. property as it existed in 1888 shown on Def.'s Ex. 1. *Compare* Def.'s Ex. 1 *with* Ex. 3.

24. Portland Steam Packet Co. is the only Simba predecessor-in-title to have received a conveyance directly from Henry Bradbury. *See* Summ. Ex. Simba's Chain of Title (showing only Parcels B and C originating from H. Bradbury).

25. No other rights over Bradbury Court were granted or otherwise established through Henry Bradbury's conveyances to Portland Steam Packet Co. Tr. I at 65:16-66:16; Deeds at 386-401; 388-95.

26. Neither Henry Bradbury nor Portland Steam Packet Co. owned the parcels abutting Bradbury Court's southwesterly boundary at the time the Bradbury Court easement was created in 1871. Tr. I at 109:24-110:25; Summ. Ex. Simba Chain of Title (showing parcels D and E owned by Dyers circa 1871 after entire "portion of B & C" was conveyed back to Bradbury in 1865).

8

27. Bradbury Court was never dedicated as a public way, and the City of Portland has never acted upon or accepted Bradbury Court as if it had been dedicated. Tr. I at 58:17-59:8.

28. Simba owns the fee to the Benefited Parcels, along with several neighboring parcels that Portland Steam Packet and/or its successors-in-title acquired after Bradbury's conveyance of the two parcels benefited by the Bradbury Court easement.

29. An easement holder cannot acquire an easement greater in scope than the one existing on the date of the easement's execution and delivery. *See Willband v. Knox County Grain Co.*, 145 A. 405, 408 (Me. 1929).

30. To determine the scope of an easement, "the question is whether a particular use would have been within the contemplation of the parties to the original conveyance." *Wardwell v. Duggins*, 2016 ME 55, ¶ 12, 136 A.3d 703, 706. "In other words, the question is whether a use was 'reasonably foreseeable' at the time of the grant." *Id.* (quoting *Pettee v. Young*, 2001 ME 156, ¶ 15, 783 A.2d 637).

31. An easement may accommodate modern developments, such as motor vehicle use over an easement granted for carriage travel prior to the ubiquitous use of motor vehicles, but "[a]ny changes in use, however, must be consistent with the purpose for which the easement was originally granted." *Guild v. Hinman*, 1997 ME 120, ¶ 6, 695 A.2d 1190; *see also Stevens v. Anderson*, 393 A.2d 158, 159 (Me. 1978).

9

32. A dominant estate owner may not use an easement to access property that the parties to the conveyance did not originally contemplate would be served by the easement. *Flaherty v. Muther*, 2011 ME 32, ¶ 74, 17 A.3d 640, 659–60.

33. These principles of law operate to limit Simba's easement rights over Bradbury Court to the right to pass over Bradbury Court between Fore Street and each of the two Benefited Parcels.

34. Simba makes several arguments that portions of its property beyond the two Benefited Parcels have easement rights over Bradbury Court, or that its easement rights are broader than the rights created in the deeds by which Henry Bradbury conveyed the Benefited Parcels to Portland Steam Packet Co., but the record evidence does not substantiate any of those arguments.

35. Simba claims that a 1984 deed from Jordan's Meats, one of Simba's predecessors in interest, grants an easement over Bradbury Court that benefits portions of the Simba Property, beyond the two Benefited Parcels. The record does include a 1984 deed from Jordan's Meats that purports to convey easement rights in Bradbury Court substantially broader than the rights conveyed or created by Henry Bradbury, both in terms of the property benefited and the uses permitted. *Compare* Deed at Book 3992, Page 18 *with* Deed at Book 6644, Page 144.

36. However, the record evidence does not establish that Jordan's Meats had any easement rights in Bradbury Court beyond the rights held by virtue of Henry Bradbury's grants of easements benefiting the two Benefited Parcels.

10

37. Jordan's Meats never owned any fee interest or held title to Bradbury Court as of the date of the 1984 deed, such as would enable Jordan's Meats to convey easement rights in Bradbury Court greater than those conveyed to the two Benefited Parcels.

38. Moreover, although the principal of Jordan's Meats, Joseph Jordan, may also have been the principal of Northland Leasing, Inc., which briefly held title to Bradbury Court, Northland Leasing acquired title in 1985, well after Jordan's Meats had issued the 1984 deed. Northland Leasing's after-acquired title cannot have related back to the Jordan Meats deed.

39. Even if Jordan's Meats had owned the Simba Property at the same time Northland Leasing owned Bradbury Court, the fact that the two different corporate entities had the same individual principal is not sufficient as a matter of law to support the conclusion that Bradbury Court and the Simba Property were in common ownership, and does not otherwise validate Jordan Meats's grant of easement rights that it did not have the right to convey.

40. Beyond its argument based on the 1984 Jordan Meats deed, Simba argues that other portions of its property were benefited by an implied easement, but the record evidence does not support a finding or conclusion that these other parcels were ever benefited by an easement by necessity or other form of implied easement over Bradbury Court.

11

41.    Accordingly, Simba's easement rights in Bradbury Court are limited to the deeded right to access Fore Street granted to the two Benefited Parcels by the 1871 deeds from Henry Bradbury to Portland Steam Packet Co.  *See* Deed at 386-401; Deed at 388-95; Ex. 3. The portions of Simba's property other than the two Benefited Parcels do not have any easement rights over Bradbury Court. Moreover, Simba's easement over Bradbury Court is limited to pedestrian and vehicular access between Fore Street and the two Benefited Parcels.

D. *History of Use of the Bradbury Court Easement*

42.    In 1906, Portland Steam Packet's successor-in-title, Chase Transfer Co., acquired an abutting parcel that included frontage along Fore Street, providing the entire Chase Transfer Co. property, including the two Benefited Parcels, with direct access to Fore Street.  *See* Deed at Book 777, Page 277.  As a result, neither Simba nor its predecessors in title since 1906 has needed to use the Bradbury Court easement for vehicular or pedestrian travel between Fore Street and the two Benefited Parcels.

43.    In 1912, Simba's predecessor Chase Transfer Co. acquired the first of two parcels abutting Bradbury Court's southwesterly boundary line.  Deed at Book 884, Page 224; Summ. Ex., Simba's Chain of Title (Parcel A).  In 1944, Simba's subsequent predecessor-in-title Chase Transfer Corp. acquired the second of two parcels abutting Bradbury Court's southwesterly boundary.  Deed at 1737-196; Summ. Ex., Simba's Chain of Title (Parcel E).

12

44. Historical maps and plans establish that, by 1923, buildings stood on what is now the Simba Property along the two Benefited Parcels' frontage on Bradbury Court. Tr. I at 35:1-19.

45. In 1950, Simba's predecessor-in-title demolished the building that abutted the Bradbury Court easement area along Bradbury Court's westerly sideline. Ex. 24 at unnumbered p. 52 (Demolition Permit dated Aug. 10, 1950).

46. The record does not reveal whether Simba's predecessors did or did not make use of the Bradbury Court easement while the buildings were in place between 1923 and 1950.

47. By 1954, Simba's predecessor-in-title had constructed a new building on the two Benefited Parcels abutting Bradbury Court. The reconstructed building also extended along Bradbury Court's southerly boundary. Ex. 14 at 3 (depicting building as constructed along Bradbury Court); Ex. 5 (1983 survey mapping building location along Bradbury Court); Tr. I at 21:20-23:17.

48. Geologist John Marchewka, in uncontroverted expert testimony, established that historic topographic data indicates that the level of Bradbury Court prior to 1983 was up to 3 feet below the foundation wall built along Bradbury Court's westerly sideline. Ex. 6 (showing topographic lines gradually dropping from elevation above 20 feet along Bradbury Court's easterly line to 19, 18 and 17 feet along Court's westerly line); Tr. I at 135:17-136:23, 155:20-25. Because of the difference in elevation between Bradbury Court and the top of the foundation along

13

both of the two Benefited Parcels, it would not be possible for a vehicle to travel between either of the Benefited Parcels and Fore Street.

49. On the other hand, the difference in elevation would not have prevented pedestrian access between the Benefited Parcels and Fore Street, nor would it have prevented Simba's predecessors from using Bradbury Court to move goods or inventory between Fore Street and loading docks at the back of their buildings. There were no structures located on Bradbury Court that would have prevented such use of Bradbury Court. The record does not reveal whether either pedestrian access or loading dock access along Bradbury Court occurred while there were buildings on the Simba Property abutting Bradbury Court during the 1950's into the 1980's.

50. However, the fact that Jordan's Meats issued a deed in 1984 incorporating (and ineffectually purporting to expand) the Bradbury Court easement plainly shows Simba's predecessor's intent not to abandon the easement.

51. Simba's predecessor-in-title maintained the buildings along the west and south sides of Bradbury Court until they were fully demolished in or around November 1986. Ex. 5 (1983 survey showing location of buildings along Bradbury Court); Def.'s Ex. 7 at 19-20 (Tax Card, "Building Permit Record" section showing partial demolition dated November 1985, and remainder of demolition dated November 1986).

14

52. Although Simba's predecessor demolished the buildings that abutted Bradbury Court in or about 1986, the building foundation walls running parallel and adjacent to Bradbury Court remained in place after the demolition. Whitaker Dep. 24:5-18; Tr. I at 22:16-25, 27:24-28:3.

53. Simba's predecessor developed the parking lot now existing on the Simba Property at 216 Fore Street using a site plan originally dated August 20, 1985, Ex. 6, and subsequently approved for construction by the City of Portland on November 19, 1986 Def.'s Ex. 7 at 15 (showing version of Exhibit 6 city-stamped as "Approved Site Plan").

54. Simba's predecessor-in-title intended to leave the foundation walls behind: Both versions of the Simba Property's site plan, Ex. 6 and Def.'s Ex. 7 at 15, feature note the developer's intention to leave the foundation walls behind, stating: "Existing Building Foundation Wall Along Property Line To Remain." Ex. 6; Def.'s Ex. 7 at 15.

55. One effect of leaving the building foundation walls in place was to optimize the number of available parking spaces for its parking lot by allowing more cars to park closer to the boundary line than would be possible if the wall were removed. Tr. I at 45:23-46:12, 151:12-25. Another effect was to leave open the possibility of another set of buildings being built atop the foundation walls.

56. By December 1987, clean fill had been placed against the Simba predecessor's remaining foundation wall to raise the level of Bradbury Court to the

top of the foundation walls abutting its westerly and southerly boundaries. Tr. I at 146:6-147:2, 152:1-10; Ex. 7 (showing as-built parking lot abutting Bradbury Court). The fill to raise and expand Bradbury Court was added to enable Bradbury Court to be included in a private parking area benefiting what is now the Flagg Property, as depicted in the as-built Sebago Technics plan shown in Exhibit 7.

57. Around the same time—the 1980's--a stockade fence was constructed across Bradbury Court's westerly and southerly sidelines. Tr. I at 31:4-18; Ex. 7 (1985 boundary survey showing stockade fence[1]); Ex. 22 (photograph depicting stockade fence across westerly and southerly Bradbury Court sidelines).

58. In February 1992, Simba acquired the Simba Property at 216 Fore Street. Deed at Book 9940, Page 159.

59. Before purchasing the Simba Property, Simba had received and reviewed the marketing materials shown in Exhibit 21, which includes a photograph, shown in larger scale in Exhibit 22, depicting the Simba Property's separation from Bradbury Court by both the concrete foundation wall and the granite block foundation, and also a stockade fence constructed across Bradbury Court's westerly and southerly sidelines. Tr. II at 97:23-101:12.

---

[1] Ex. 7 indicates that it was completed in 1985 and revised in 1987 "to show as built conditions" so the stockade fence was in place at least as of 1987, perhaps earlier.

16

60. The elevations of the remaining foundation walls that currently separate the Simba Property from Bradbury Court have remained fundamentally unchanged since Simba acquired the property in 1992. Tr. II at 104:7-18.

61. Sometime between 1992 and 2001, Flagg's predecessor-in-title removed the stockade fence and installed a split-rail guardrail across Bradbury Court's westerly sideline, continuing to block access over Bradbury Court between the Benefited Parcels and Fore Street. Tr. I at 34:20-25; Tr. II at 108:6-109:3, 142:21-143:18.

62. Simba never objected to the construction or maintenance of the guardrail, which blocks passage over Bradbury Court's westerly sideline, at least in part because the guardrail prevented and still prevents cars on Flagg parking area from rolling onto the Simba Property. Tr. II at 109:2-6.

63. Based on the court's view of the property, a poured concrete foundation and a granite block foundation, each several feet high, physically separate the Simba Property from Bradbury Court. Trial exhibit 23 indicates that the Simba Property is three or four feet lower in elevation than Bradbury Court along the portion of Bradbury Court abutting the two Benefited Parcels. Thus, vehicular access between Bradbury Court and the two Benefited Parcels continues to be impossible, and pedestrian access would be possible only by either climbing onto or jumping off the foundation wall.

17

64.    The only physical sign of pedestrian access between the Simba Property and Bradbury Court is a worn dirt path within a few feet of the Fore Street sidewalk, at a point where Bradbury Court is only two feet higher than the Simba Property. The worn area is shown on Trial Exhibit 23. *See* Tr. Ex. 23 at point B10. This path is nearer Fore Street than either of the two Benefited Parcels so it does not reflect any historical pedestrian access within the scope of Simba's easement.

65.    Since Simba acquired the Simba Property, Simba personnel have used Bradbury Court to load heavy machinery onto a truck from Bradbury Court's southerly sideline and to remove snow from the Simba parking lot. Tr. II at 13: 8-11, 14:17-20, 17:1-12; 20:25-21:8, 44:17-19. How many times Simba personnel accessed Bradbury Court and exactly what they did is not entirely clear from the record. *See* Tr. II 17:1-5 ("My brother-in-law, John Hothersall, hundreds of times"); *id.* 9-10 ("I used Bradbury Court to load equipment two or three times"). The testimony demonstrated that equipment was loaded at Bradbury Court's southerly end, not along westerly sideline that abuts the Benefited Parcels. Tr. II at 20:25-21:8.

66.    Additionally, Simba personnel have counted cars in the Simba lot while standing on Bradbury Court, and Simba has maintained some of the grass and shrubs growing along Bradbury Court. Tr. II at 44:25-45:1, 46:15-23, 63:21-64:5.

67.     Flagg contends, correctly in the court's view, that none of Simba's uses of Bradbury Court is within the scope of Simba's easement, but Simba responds, also correctly in the court's view, that its periodic use of Bradbury Court since 1992 is relevant to whether Simba intended to retain the easement or abandon it.

68.     Flagg's predecessor-in-title, James MacAdam, never witnessed Simba accessing or using Bradbury Court 2001 and 2017, when MacAdam owned the Flagg Property and worked at the 208 Fore Street building. Tr. II at 143:23-147:12. This suggests that Simba's use may be less—perhaps much less—than the "hundreds of times" suggested in Roger Hale's testimony. On the other hand, the fact that Mr. MacAdam did not see Simba using Bradbury Court does not mean the use never happened.

69.     Around 2016, prior to Flagg's acquisition of Bradbury Court, Simba developed and submitted plans to construct a multi-level parking garage structure on the Simba Property. Tr. II at 64:21-65:13; Ex. 32.

70.     The access ramp shown on Simba's proposed design for the multi-level garage runs the entire length of Bradbury Court to provide a secondary garage entrance over Bradbury Court's southerly sideline. Tr. II at 65:14-66:22; Ex. 32. However, Simba's easement confers a right of access over Bradbury Court only into the two Benefited Parcels on Bradbury Court's westerly sideline, and does not confer any right to access the Simba Property over Bradbury Court's southerly sideline.

19

71. In addition, Simba's parking garage design would allow access over Bradbury Court between Fore Street and portions of the Simba Property not benefited by the easement, thereby possibly overburdening the easement.[2]

72. Simba's proposed garage design would add about 102 additional parking spaces to Simba's garage capacity, a 27 percent increase above the number of spaces available without the secondary access ramp over Bradbury Court. Tr. II at 65:14-66:22; Ex. 32 (showing an estimated 474 total spaces for design incorporating Bradbury Court).

73. Simba's proposed garage design was not approved by the City of Portland Planning Board, and has not been re-designed or resubmitted for additional consideration for Planning Board approval. Tr. II at 117:21-118:10, 124:25-125:18.

74. Simba's application for approval of its proposed garage design occurred prior to Flagg's acquisition of Bradbury Court. Tr. II at 125:13-18.

75. In June 2017, Flagg acquired Bradbury Court and the remainder of the 208 Fore Street property. Deed at Book 34121, Page 142.

76. Northeast Civil Solutions prepared a survey for Flagg depicting a location of Bradbury Court's westerly sideline that differed from prior, unrecorded

---

[2] This Decision and Judgment does not venture any view of whether Simba's easement would permit it to construct a multi-level parking garage even if the access ramp were to enter one of the two Benefited Parcels and even if all parking spaces accessible from Bradbury Court lay within the footprint of the two Benefited Parcels. There is no indication Simba has considered such a plan and thus no need to address it.

20

surveys. Compare Joint Ex. 10 *with* Exs. 6, 8. Simba raised a question regarding the accuracy of the Northeast Civil Solutions survey in terms of its depiction of the westerly boundary of Bradbury Court.

77. Relying on the expertise of its surveyors and on the advice of counsel, Flagg submitted the Northeast Civil Solutions survey and its proposed project design plans to the City of Portland Planning Board in April 2018 to solicit comments on the project design, while the parties worked on resolving their disagreement about Bradbury Court's westerly boundary. Tr. I at 170:4-20, 171:13-17, 184:10-15; Ex. 26. The evidence does not support a finding that Flagg acted with malice in its use of the survey, or acted in reckless disregard of whether the survey accurately depicted Bradbury Court's westerly boundary.

78. The Planning Board was notified of the parties' disagreement about the location of Bradbury Court's westerly boundary line on or before August 2018. Tr. II at 132:1-10.

79. Flagg submitted a revised survey and revised project design plans to the Planning Board conforming to the boundary line asserted by Simba in June 2019, the earliest date the complete submission could be revised. Tr. I at 172:12-17; Ex. 11; Ex. 33.

80. Simba paid an estimated $10,000 in survey fees to secure Sebago Technics as a potential expert witness to call at trial, although a lesser sum was quoted to locate the Bradbury Court line. Tr. II at 128:11-130:10; 131:2-12.

E. *The Parties' Declaratory Judgment Claims*

81.   Flagg in Count I of its First Amended Complaint and Simba is Count I of its Counterclaim have both requested declaratory relief regarding the scope and status of Simba's easement over Bradbury Court.   Declaratory relief pursuant to 14 M.R.S.A. § 5953 is appropriate here because the issue involves the parties' respective rights under deeds and there is an actual dispute in controversy, both as to the scope and extent of Simba's easement and as to whether the easement has been abandoned.   Accordingly, the judgment adopted below for entry includes a declaration as to the scope and extent of the easement and as to its present status.

82.   As to the scope and extent of Simba's easement, Simba bears the burden of proof to show that its rights are as extensive as Simba claims.   *See Amodeo v. Francis*, 681 A.2d 462, 466 (Me. 1996).

83.   The Bradbury Court grantor intended to grant Portland Steam Packet Co. a limited easement over Bradbury Court exclusively for the purpose of access to and from Fore Street, via foot or vehicle, benefiting only the two parcels conveyed to Simba's predecessor-in-title the June 13, 1871 deed recorded at the Registry of Deeds in Book 386, Page 401, and the August 30, 1871 deed recorded in Book 388, Page 95 (the Benefited Parcels).

84. The Benefited Parcels share a 110-foot common boundary with Bradbury Court's westerly sideline as depicted in Exhibit 3. The Benefited Parcels share no common boundary with, and have no connection to Bradbury Court's southerly sideline.

85. No parcel abutting Bradbury Court's southerly boundary line was benefited by Henry Bradbury's grant of limited easement rights to Simba's predecessor-in-title, and no parcel was benefited by easement rights through a separate grant.

86. Accordingly, the declaratory judgment below establishes that Simba's easement benefits only the two Benefited Parcels and permits passage between only the Benefited Parcels and Fore Street.

87. The parties' request for a declaratory judgment as to the current status of Simba's easement depends on the resolution of Flagg's quiet title claim based on alleged abandonment of the easement. For the reasons set forth below, the court concludes that Flagg has failed to prove abandonment and therefore grants Simba declaratory judgment that Simba continues to have the easement rights defined herein.

F. *Flagg's Quiet Title Claim for Abandonment of Easement*

88. Flagg's claim in Count II of its First Amended Complaint seeks to quiet title pursuant to 14 M.R.S. § 6652 on the ground that Simba has abandoned its easement in Bradbury Court.

23

89.    The Maine Law Court has summarized as follows the primary principles of law that apply to a claim of abandonment of an easement:

> Although mere non-use is not enough, an easement created by deed or grant may be extinguished by abandonment.  An easement may be abandoned by unequivocal acts inconsistent with the further assertion of rights associated with the existence of the easement. The acts asserted as evidence of abandonment must be decisive and conclusive and thereby indicate a clear intent to abandon the easement. We have previously held that an easement holder's intention to abandon an easement may be shown from his failure to object to the erection of a permanent structure that prevents the enjoyment of the rights granted by the easement.  [T]he party claiming an abandonment ha[s] the burden of proof.

*Chase v. Eastman,* 563 A.2d 1099, 1102 (Me. 1989) (internal citations omitted). *See also Gravison v. Fisher,* 2016 ME 35, ¶ 52, 134 A.3d 857; *Stickney v. City of Saco,* 2001 ME 69, ¶ 51, 770 A.2d 592.

90.    In its most recent discussion of the law of abandonment of easement, the Law Court noted the difference between a claim of abandonment of an easement and a claim of adverse possession of an easement. *See Dupuis v. Ellingwood,* 2017 ME 132, ¶¶ 9-16, 166 A.3d 112. Adverse possession is not an issue in this case.[3]

91.    Several of the Law Court's decisions in this area have noted that abandonment of an easement can be established when the holder of the easement fails to object to the construction and maintenance of a structure upon the easement

---

[3]    Just before trial, Flagg attempted to assert an alternative claim of adverse possession, but Simba objected on the ground that Flagg had not pleaded adverse possession as a theory of liability in its amended complaint.   The court gave Flagg the choice of proceeding on both theories but ruled that, if Flagg elected to do so, Simba would be granted a continuance of trial to prepare a defense of the adverse possession claim.  Flagg elected to proceed only on its abandonment claim rather than have the trial continued. *See* Supplemental Order on Pretrial Motions and Objections at 2 (Aug. 30, 2019).

24

that permanently prevents use of the easement. Such was the situation in *Dupuis, Chase* and *Gravison*—in each instance, the portion of the easement occupied by structures had been abandoned, but the remaining portions of the easement had not been abandoned. *See also Fitzpatrick v. Boston & Maine Rail Road,* 84 Me. 33, 37-38, 24 A. 431 (1891) (easement holder's failure to object to permanent structures obstructing easement supported finding that easement was abandoned); *Ballard v. Butler,* 30 Me.94, 98-99 (1849) (failure of easement holders to construction of permanent structure over well supported finding of abandonment of easement to use well).

92.     However, "neither the building of a fence across an easement and using it for pasturage, nor a right-of-way overgrown with trees, blocked by rocks, and inaccessible by car for many years, is sufficiently adverse to constitute abandonment." *Rutland v. Mullen,* 2002 ME 98, ¶ 10, 798 A.2d 1104, *citing Phillips v. Gregg,* 628 A.2d 151, 152 (Me. 1993); *Bartlett v. City of Bangor,* 67 Me. 460, 466 (1878).

93.     There has never been any building or structure located on Bradbury Court as far as the record evidence indicates.

94.     However, Flagg's proposed findings of fact and conclusions of law identify four acts or omissions by Simba or its predecessors that Flagg contends are sufficient to sustain its burden of persuasion:

> "a. Between at least 1954 and 1986, Simba's predecessor-in-title
> constructed and maintained a building that fully blocked the

25

Benefited Parcels' entire 110-foot-long point of access to Bradbury Court. As of 1906, Simba's predecessor had established a more direct access to Fore Street over its own after-acquired property. Bradbury Court's natural topography in the area abutting the Simba predecessor's building further demonstrates that Bradbury Court was not utilized as a point of access for the building.

"b. Simba's predecessor-in-title, while planning for the demolition of the building along Bradbury Court and the development of the surface parking lot now located on the Simba Property, made the affirmative choice to leave behind the building's foundation walls along Bradbury Court, which is expressly stated in the site plan shown in Exhibit 6 and in Defendant's Exhibit 7 at 15. Leaving the foundation wall standing benefited Simba's predecessor by allowing it to better utilize more of the Simba Property for parking. But, Simba's predecessor's intentional acts also cut its own Benefited Parcels off from the benefit of Bradbury Court because of the wall left separating the properties.

"c. Bradbury Court's westerly sideline was additionally obstructed by a stockade fence and a split-rail guardrail. The split-rail guardrail, which still remains today, was installed by Flagg's predecessor-in-title between 1992, after Simba acquired the Benefited Parcels, and 2001. Simba never objected that the guardrail blocked the Benefited Parcels' access via Bradbury Court. Simba's failure to object to the permanent structure installed over and above the elevated foundation wall constituted a conclusive omission 'inconsistent with the further assertion of rights associated with the existence of the easement,' *Dupuis*, 2017 ME 132, ¶ 10.

"d. Bradbury Court was filled and elevated approximately 3.5 feet further above the Benefited Parcels in 1987 without objection by Simba's predecessors. This failure to object to the permanent redesign of the Bradbury Court easement area similarly constituted a conclusive omission 'inconsistent with the further assertion of rights associated with the existence of the easement' id."

Plaintiff's Proposed Findings of Fact and Conclusions of Law at 16-17.

26

95. For the reasons that follow, none of these four points—whether they are considered together or separately—suffices to prove to a high probability that Simba or its predecessors abandoned the easement.

96. As Flagg points out, there were buildings on the Simba Property abutting the west and south sides of Bradbury Court, including along the 111 feet across which the two Benefited Parcels abut Bradbury Court, at various times between 1923 and 1950 and between 1954 and 1986. However, the record does not show whether Simba's predecessors did—or did not—use Bradbury Court to travel between Fore Street and any of those buildings. Because no structure was ever built on Bradbury Court, there appears no reason why Simba's predecessors could not have used Bradbury Court for access to the rear of the buildings. The difference in elevation between the buildings and the surface of Bradbury Court would not have prevented access to loading docks, for example.

97. Flagg's argument emphasizes that Simba has not shown that its predecessors actually used the Bradbury Court easement during the 1923-86 period, but this argument fails to recognize that it is Flagg that has the burden of persuasion to show that it is "highly probable" that no use of the Bradbury Court easement was made during that period. Mere non-use is not enough to prove abandonment, *see Chase v. Eastman,* 563 A.2d at 1102, but affirmative proof of non-use is a necessary, albeit not sufficient, ingredient of Flagg's burden of persuasion. *See Phillips v. Gregg,* 628 A.2d at 152 ("The party [claiming abandonment] may

27

meet that burden by showing a history of nonuse coupled with an act or omission evincing a clear intent to abandon").

98. Flagg contends that it has met its burden of proving non-use and that Simba was required to present some evidence that it or its predecessors had used the easement, *see* Plaintiff's Proposed Findings of Fact and Conclusions of Law at 17, *citing Dupuis v. Ellingwood,* 2017 ME 132, ¶¶ 12-13. However, proof of mere non-use is not sufficient. Flagg was required to show "an act or omission evincing a clear intent to abandon."

99. As to the periods between 1923 and 1950 and between 1954 and 1986, during which buildings stood on Simba's property next to Bradbury Court, Simba's predecessors' construction and maintenance of buildings that could have been accessed from Bradbury Court does not demonstrate the required clear intent to abandon.

100. Moreover, the record contains evidence affirmatively indicating that Simba and its predecessor, Jordan Meats, intended to retain their easement rights. The fact that Simba's predecessor, Jordan's Meats, purported to convey an easement benefiting its entire property in 1984 plainly evinces an intent on its part to retain and convey the easement. Flagg is correct that the 1984 Jordan Meat's deed did not and could not operate to expand Simba's easement rights, but the ineffectual conveyance is still relevant to the easement holder's intent. Moreover, the conveyance can be interpreted to indicate that Jordan's Meats had in fact made

28

use of Bradbury Court to access its property and was attempting to convey the right to do so to its successor in interest.

101. With regard to the period since 1986, Flagg's argument for abandonment hinges on the facts that Simba and its predecessors have failed to object to the stockade fence and more recently the guardrail along Bradbury Court's westerly and southerly sides, that the elevation of Bradbury Court was increased to match the remainder of the Flagg Property sometime around 1987, and that Simba's predecessor left foundation walls in place.

102. But Simba's and its predecessors' failure to object to these changes does not equate to the clear and decisive evidence of intent to abandon that the law requires Flagg to present. The elevation change arguably would make it easier to use Bradbury Court to access the rear of any future buildings erected on the existing foundation walls. The stockade fence and guardrail have served Simba's purposes by preventing vehicles on either property from accidentally rolling onto the other property.

103. Moreover, the weight of Flagg's evidence regarding the period since 1986 is undercut by the evidence that since 1992 Simba has, albeit sporadically, used Bradbury Court for snow removal and loading vehicles. Flagg contends, correctly, that none of these uses is within the scope of Simba's easement rights, but Simba responds, also correctly, that the issue at hand is not whether Simba's

29

uses of Bradbury Court were within the scope of the easement but whether Simba actually intended to abandon its easement rights.

104. Still more evidence of Simba's intent to maintain the easement is the fact that Simba proposed to use Bradbury Court as a means of access to Simba's parking garage. Simba developed its proposal before Flagg had acquired the Flagg Property and therefore well before Simba could have anticipated Flagg's abandonment claim. Flagg objects on the ground that Simba's parking garage proposal was inconsistent with Simba's easement rights, but the objection is beside the point, because the question is one of Simba's intent to exercise its easement rights.

105. Weighing all of the evidence, the court concludes that Flagg has failed to meet its burden to show by clear and convincing evidence that Simba's easement has been abandoned, either by Simba or by Simba's predecessors. Accordingly, Simba will be granted judgment on Count II of Flagg's amended complaint, for quiet title.

G. *Flagg's Boundary by Acquiescence Claim*

106. Count III of Flagg's amended complaint asserts a boundary by acquiescence claim, but, as Simba notes in its reply brief, Flagg's proposed findings of fact and conclusions of law do not address the claim. Flagg's proposed findings and conclusions state that Flagg is not seeking a declaration as to the location of

the boundary, indicating that the claim is not being pursued, although it has not formally been withdrawn or dismissed voluntarily.

107. Even if it had been maintained, the court would have found and concluded that Flagg had failed to establish that either Simba or Simba's predecessors had acquiesced to a boundary other than that the parties now agree is the correct one. *See Dowley v. Morency*, 1999 ME 137, ¶ 16, 737 A.2d 1061.

108. Simba will be granted judgment on Count III of Flagg's amended complaint.

*H. Simba's Slander of Title Claim*

109. Count III of Simba's Counterclaim asserts a claim for slander of title. Specifically, Simba alleges that Flagg committed slander of title by filing the Northeast Civil Solutions survey, with its inaccurate depiction of the parties' common boundary, with the City of Portland.

110. The tort of slander of title "protects a person's property interest against words or conduct which bring or tend to bring the validity of that interest into question." *Colquhoun v. Webber*, 684 A.2d 405, 410 (Me. 1996).

111. Simba's burden of persuasion on its slander of title requires proof of the following elements: "(1) publication of a slanderous statement disparaging a claimant's title to an interest in land, (2) the statement was false, (3) the statement was made with malice or with reckless disregard of its falsity, and (4) the statement caused actual damage." *Pettee v. Young*, 2001 ME 156, ¶ 20, 783 A.2d 637.

31

112. Simba failed to establish that Flagg submitted the survey to the Portland Planning Board with malice or with reckless disregard for its falsity. Flagg initially relied on its surveyor's expertise and then on the advice of its counsel in its submission of the survey to the City.

113. Flagg will be granted judgment on Count III of Simba's Counterclaim

I. *Simba's Request for Injunctive Relief*

114. Count II of Simba's counterclaim seeks injunctive relief, to enjoin Flagg from constructing a building on Bradbury Court. It is true that Flagg has proposed to construct a building that would permanently block Simba from using Bradbury Court. On the other hand, Flagg has delayed its proposal and initiated this action, which plainly indicates that Flagg does not intend to proceed with construction until clarifying its legal right to proceed. The court is not persuaded that the present record justifies the discretionary grant of injunctive relief to either party.

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

1. Judgment is granted to Plaintiff Flagg Partners, LLC on Count I of its First Amended Complaint.

2. Judgment is granted to Defendant Simba, Inc. on Counts II and III of Plaintiff's First Amended Complaint.

3. Judgment is granted to Defendant Simba, Inc. on Count I of its Counterclaim.

32

4. Judgment is granted to Plaintiff Flagg Partners, LLC on Counts II and III of Defendant's Counterclaim.

5. The court's declaratory judgment on Count I of the First Amended Complaint and Count I of the Counterclaim is as follows:

By virtue of its ownership of the two lots conveyed in the deeds from Henry Bradbury to Portland Steam Packet Co, recorded at Book 386, Page 401 and Book 388, Page 95 of the Cumberland County, Maine Registry of Deeds, Simba, Inc. is the holder of an easement appurtenant over the premises known as Bradbury Court owned by Flagg Partners, LLC, for the sole benefit of the two lots described in the aforementioned deeds. Said easement permits vehicular or pedestrian travel originating within either of the said two lots over the portion of Bradbury Court abutting either of said lots and continuing to Fore Street and vehicular or pedestrian travel from Fore Street over Bradbury Court and terminating within either of the said two lots. The easement described in this paragraph has not been abandoned.

6. Neither party can be said to have substantially prevailed, so each party shall bear its own attorney fees and costs.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Decision and Judgment in the docket.

Dated January 3, 2020

A. M. Horton, Justice

Entered on the Docket: 1/6/20

33